UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

JOSE LUGO,                               :

                Plaintiff,               :            REPORT &
                                                      RECOMMENDATION
                                         :
            - v. -                       04 Civ. 1064 (JSR)(MHD)
                                         :
JO ANNE B. BARNHART,
Commissioner of Social Security,         :

                Defendant.               :

------------------------------------x

**TO THE HONORABLE JED S. RAKOFF, U.S.D.J.:**


Plaintiff Jose Lugo filed this action pursuant to the Social
Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). He seeks review
of the December 6, 2003 determination by the Commissioner of the
Social Security Administration ("Commissioner") denying his three
merged applications for Supplemental Security Income ("SSI")
benefits -- dated December 22, 1993, November 12, 1997, and August
31, 1999, respectively -- based on a finding that he was not
disabled.


The Commissioner has moved to remand this action for further
administrative proceedings. He seeks this remand to reopen the
evidentiary record and to permit the Administrative Law Judge
("ALJ") to explain how he weighed the medical evidence and medical
opinions to arrive at his conclusion that plaintiff was able to
perform light work. Plaintiff has cross-moved for remand solely for

calculation of SSI benefits.

For the reasons that follow, we recommend that the Commissioner's determination be reversed, that his motion for a remand be granted, that the plaintiff's cross-motion be denied and that the case be remanded for further administrative proceedings.

## I. Procedural History

### 1. The December 28, 1993 Application and the First Federal Court Action

On December 28, 1993, plaintiff filed his first application for SSI benefits. (Administrative Record Transcript ("Tr.") 39-41.) A Disability Determination and Transmittal form, dated March 30, 1994, indicated Lugo's primary diagnosis as alcoholism and his secondary diagnosis as arthralgia.[1] (Tr. 42.) The Social Security Administration ("SSA") initially denied plaintiff's application on April 5, 1994. (Tr. 64.) According to the SSA, the medical evidence showed that Lugo had "pain and stiffness with some restriction of [his] activities and the ability to function normally in every day life," but that he was capable of performing "medium work." (Tr. 66.) The plaintiff filed for reconsideration (Tr. 67), and on

---

[1] Arthralgia is defined as "pain in a joint." Dorland's Illustrated Medical Dictionary 140 (28th ed. 1994) [hereinafter Dorland's].

2

January 19, 1995, the Commissioner denied the request. (Tr. 90.) In March 1995, plaintiff requested a hearing before an ALJ. (Tr. 94.) On December 8, 1995, ALJ Mary Cerbone presided over a hearing (Tr. 24-38), at which Lugo was represented by Vivian De La Cruz of Harlem Legal Services. (Tr. 26.)[2]

On January 5, 1996, ALJ Cerbone issued her decision. (Tr. 10-18.) She found the plaintiff not disabled and not eligible for SSI payments despite his alleged drug, alcohol, kidney and low-back problems. (Tr. 13.) Specifically, she found that while Lugo could not perform his past relevant work, he could perform a "wide range of light work," that there were no "significant" non-exertional limitations that would compromise his capacity to perform light work, and that his testimony regarding constant and totally disabling pain was "not . . . credible to the extent alleged." (Tr. 17-18.)

Plaintiff subsequently filed a request for review with the SSA Appeals Council. On April 10, 1997, the Appeals Council denied plaintiff's request. (Tr. 5-6.)

On May 30, 1997, Lugo filed a complaint in this court seeking

---

[2] This hearing, like the two subsequent ones, was conducted with the assistance of a Spanish interpreter. (Tr. 26, 540, 553.)

review of the ALJ's January 5, 1996 decision. The Commissioner moved, in March 1998, for judgment on the pleadings. In June 1998, Magistrate Judge Katz issued a Report and Recommendation ("R&R"), recommending affirmance of the SSA's denial of benefits. In doing so, he reviewed the treating and consultative physicians' reports and the ALJ's decision and found that the Commissioner's determination that plaintiff was not disabled and was capable of light work was supported by substantial evidence, that the ALJ had not erred in declining to accord controlling weight to the opinion of Lugo's treating physician and that the ALJ had fulfilled her duty to develop the record. (Tr. 191-211.) In short, Judge Katz recommended that the defendant's motion for judgment on the pleadings be granted and the Commissioner's decision affirmed. (Tr. 191.)

On September 28, 1998, the District Court declined to adopt Judge Katz's R&R and instead remanded the case "to further consider any relevant evidence bearing on plaintiff's claims of severe pain and, if she adheres to her original determination, to set forth the reasons these claims are found incredible." (Tr. 217.) The SSA remanded the case to ALJ Newton Greenberg, who conducted a hearing on August 28, 2000. (Tr. 218-25.) For purposes of that hearing, the ALJ merged Lugo's 1993 application with two subsequent applications -- one filed in November 1997, while his lawsuit was pending here,

and the other filed in August 1999, after the remand order from this court. The decision by ALJ Greenberg at the 2000 hearing, later affirmed by the Appeals Council, is the subject of this Report and Recommendation.

### 2. The November 12, 1997 Application

While Lugo's lawsuit was pending in federal court, he filed a second application for SSI benefits, on November 12, 1997, alleging disability based on diabetes, arthritis and mental problems. (Tr. 243-45, 260-65.) On February 2, 1998, the SSA denied his application, finding that his condition was not severe enough to keep him from working. (Tr. 228-31.) Lugo filed for reconsideration (Tr. 232-33), and on May 12, 1998, the SSA denied the request. (Tr. 234-37.) In June 1998, plaintiff requested a hearing before an ALJ. (Tr. 238-39.)

On January 13, 1999, ALJ Greenberg presided over a hearing on the 1997 application, at which Lugo was represented by Christopher Bowes, Esq., of the Center for Disability Advocacy Rights. (Tr. 538-50.) In a decision rendered March 17, 1999, ALJ Greenberg denied Lugo's application (Tr. 169-77), finding that while he could not return to his past relevant work (Tr. 175), he retained the ability to perform the full range of light work and that his

capacity for light work was not significantly compromised by any non-exertional limitations. (Tr. 177.) In asserting that plaintiff was capable of performing light work, ALJ Greenberg found that while plaintiff's arthritis could cause back pain, "these symptoms are not of such intensity or frequency to preclude work activity," particularly given that his condition did not require physical therapy or orthopedic surgery, and that Lugo had testified that he could read, watch TV and perform light household chores. (Tr. 175.) In the "Findings" section, ALJ Greenberg opined that Lugo's allegations as to the level of pain he was experiencing were "not consistent with the objective medical evidence and [we]re not credible to the extent alleged." (Tr. 176.) In April 1999, Lugo requested Appeals Council review of the decision. (Tr. 168.)

3.    The September 20, 1999 Application
      and the August 28, 2000 Hearing

Lugo filed a third application for SSI benefits in September 1999 (Tr. 422-26), alleging that he was disabled as a result of kidney, spinal and psychiatric conditions. (Tr. 432.) The SSA denied his claim on December 6, 1999 (Tr. 409-13), finding that his condition was not severe enough to keep him from working and that based on his age, education and experience, he could perform a job requiring medium work. (Tr. 413.) Lugo filed for reconsideration (Tr. 414-15), and on April 11, 2000, the SSA denied the request.

6

(Tr. 416-19.) In May 2000, plaintiff requested a hearing before an ALJ. (Tr. 420-21.)

On August 28, 2000, ALJ Greenberg presided over the hearing, in which he "merged" Lugo's December 1993, November 1997 and August 1999 SSI applications. (Tr. 551-59.) Lugo was again represented by Mr. Bowes. (Tr. 553.) In a decision dated November 17, 2000 (Tr. 157-65), ALJ Greenberg reviewed the hearing testimony and the entire body of evidence accompanying plaintiff's three SSI applications and found Lugo's "allegations about his limitations due to pain and psychiatric problems not credible, based on the medical evidence." (Tr. 163.) While acknowledging that Lugo experienced pain, ALJ Greenberg found that the record indicated that it was "manageable with medications, and is not of such severity that it prevents the claimant from working. The claimant is employable, but is not motivated: he is a malingerer." (Tr. 163.) ALJ Greenberg also found that Lugo retained "a residual functional capacity for the full range of light work. . . . [with] no limita[ti]ons on mental functioning." (Id.)

In December 2000, plaintiff's counsel requested an Appeals Council review of the ALJ's decision (Tr. 153) and submitted a letter-brief, dated June 28, 2002, outlining specific objections to that decision. (Tr. 149-51.) The Appeals Council denied review in

a notice dated December 6, 2003. (Tr. 147-48.)

### 4. The Second Federal Court Action

On February 9, 2004, Lugo filed the instant action in federal court, seeking review and reversal of the Commissioner's determination denying all three of his applications for SSI benefits. On July 27, 2004, the Commissioner responded with a motion for remand, seeking reversal of the November 2000 decision and a remand of the case for further administrative proceedings. (Mem. of Law in Supp. of Def.'s Mot. for Remand 1.) Plaintiff has in turn sought an order finding him disabled and remanding solely for calculation of benefits. (Mem. of Law in Supp. of Pl.'s Cross-Mot. for J. on the Pleadings 1.)

## II. Factual Background

### A. Testimonial Evidence

Lugo was born on April 28, 1953 in the Dominican Republic. (Tr. 26-27.) He testified at his first hearing that he had completed one year of high school in the Dominican Republic (Tr. 28), but testified at his second hearing that he had completed only the sixth grade. (Tr. 541.) He can read and write Spanish, but

speaks no English. (Tr. 28.) He arrived in the United States in 1982 and has permanent residency status. (Tr. 27, 246-246a, 541.)

Lugo lives with his wife. (Tr. 27, 542.) He testified that he is able to take care of his basic personal needs, including dressing and washing himself, but is unable to perform household chores. (Tr. 33-34.) In the past, Lugo worked in a fish market, as a street painter and as a security officer at a supermarket, a job that required him to lift up to eighty pounds. (Tr. 28, 35.) Lugo reported last looking for work sometime between 1989 and 1991 and stated that he was receiving public assistance. (Tr. 541-42.)

Lugo has a history of drug and alcohol abuse. At his first hearing in 1995, he stated that he had last used cocaine three years previously (i.e., in 1992) and had then enrolled in a three-year treatment program, which he had completed. (Tr. 28-29.) At his second hearing, in January 1999, he stated that he had stopped using cocaine "[o]ver five or seven years ago" (Tr. 542) and that he had been a heavy drinker for many years. (Tr. 543.) Lugo's drug and alcohol use were not discussed at his third hearing.

With regard to his physical ailments, Lugo testified that he suffered from pain related to kidney stones and had undergone a

lithotripsy[3] in 1994, a procedure that destroys kidney stones with a laser. (Tr. 29, 131.) He asserted that his kidney stone attacks were accompanied by diarrhea, vomiting and pain that lasted, in slightly varying accounts, either two to three hours (Tr. 36) or five to six hours. (Tr. 555.) He stated that painkillers relieved the pain after one to two hours. (Tr. 555-56.) According to Lugo, he passed a kidney stone two weeks prior to the first hearing (Tr. 29) and a month or two before the third hearing, although at the third hearing he reported that he had had pain the week before (though he did not specifically say whether he had passed a stone). (Tr. 556.) He estimated at the third hearing that he felt the pain and vomiting symptoms associated with the stones on a more-or-less monthly basis. (Tr. 556.) As to symptoms, he described "very strong pain" in his back when he passed stones (Tr. 37), accompanied by blood in his urine. (Tr. 29, 37.) He explained that if the stone did not pass on its own, he would see a doctor. (Tr. 556.)

Lugo complained of lower back pain -- separate from the pain he experienced from kidney stones -- due to arthritis. (Tr. 30-31, 548-49, 557.) He testified that he also had arthritis in his legs, arms and neck, and that these areas would become numb and he would

---

[3] Lithotripsy is defined as "the crushing of a calculus within the urinary system or gallbladder, followed at once by the washing out of the fragments; it may be done either surgically or by several different noninvasive methods." Dorland's 952.

lose strength in his arms approximately two to three times a week. (Tr. 30.) At the third hearing, he stated that he could not move his neck, back and sometimes his hands. (Tr. 557.) At the time of the first hearing, he had been walking with a cane for ten months due to the arthritis (Tr. 30-31) and reported that, although he had taken a subway to the hearing, he experienced difficulty in traveling by public transportation, because the standing and motion caused him pain. (Tr. 27.) Also at the first hearing, he claimed that he could walk only two blocks, could stand for an hour or two, could not bend, could kneel only with difficulty, could sit for up to an hour and could carry five pounds only with difficulty. (Tr. 31-32.) At the second hearing, he asserted that he felt back pain every day and that he took medication daily to relieve the pain, but that the medication was only forty to fifty percent effective. (Tr. 548-49.)

At the first hearing, in 1995, Lugo did not testify that he suffered from any mental or emotional problems, though his disability examiner did list his alcoholism as his primary diagnosis on his Disability Determination and Transmittal. (Tr. 42.) At the second hearing, in 1999, he asserted that he had been treated at a psychiatric hospital in the Dominican Republic after having been shot and mugged when was in his twenties. (Tr. 543.) He also claimed at the same hearing that he was seeing a psychiatrist

and was taking three medications daily; however, he could remember
the name of only one, Ambien, a sleep aid. (Tr. 542, 550.) He also
reported that he was afraid to go out because he heard voices
calling him at various times during the day (Tr. 543-45), and he
alluded to experiencing problems with his memory. (Tr. 549-50.) At
his third hearing, in 2000, plaintiff's counsel asserted that Lugo
had "significant mental limitations due to major depression." (Tr.
557.)


B. The Medical Record Before the ALJ


Plaintiff was regularly treated by Dr. Clayton Natta, an
internist and hematologist, since August 14, 1992. (Tr. 128-33.)
Dr. Natta provided four reports or summaries between 1993 and 1998.
(Tr. 115, 128-31, 133-39, 500.)


According to Dr. Natta, plaintiff suffered from lower back
pain after falling twice in the snow in 1992. The pain persisted
and required analgesics. Lugo also suffered from periodic kidney
stones, which were treated by a lithotripsy at Brooklyn Hospital in
1994. (Tr. 128.) Dr. Natta diagnosed nephrolithiasis (i.e., kidney
stones) in the left kidney, Type II diabetes, atopic dermatitis,
osteoarthritis of the lumbar spine and respiratory allergies. (Tr.
131, 133.) To treat these conditions, Lugo underwent the 1994

lithotripsy, adopted a 1500—calorie diabetic diet, and received medication for periodic urinary tract infections and analgesics for his lower back pain. (Tr. 131.) According to Dr. Natta, Lugo's back pain persisted despite the use of increasingly powerful analgesics. (Tr. 131, 134.)[4]

Dr. Natta opined on two occasions -- September 14, 1995 (Tr. 137) and October 9, 1998 (Tr. 500) -- that plaintiff was unable to work, apparently because of his low-back pain. In support of that conclusion, he provided findings of lumbar spine tenderness, 2+ muscle spasm, twenty to twenty-five percent loss of motion in the lumbar spine, loss of lumbar curvature and a recurring macular rash. (Tr. 129.) He also mentioned blood in the urine, nocturia[5] and a burning sensation on urination. (Tr. 133.) As for plaintiff's physical limitations, the doctor opined that Lugo could regularly sit for only one-half hour to one hour daily, that he could stand or walk for only one hour, and that he could not lift or carry, push, pull, bend, squat, climb or reach on a sustained basis, although he could perform grasping and fine manipulation with his

_____

[4] Plaintiff first received muscle relaxants – 100 mg of Maclamen three times a day and 10 mg of Flexeril four times a day. (Tr. 131, 132.) In 1994, Dr. Natta replaced the Meclamen with Indocin, 50 mg three times a day. He later added Tylenol #3 with codeine four times a day. As of November 1995, Lugo was taking Motrin 600, Tylenol #3 and Flexeril. (Tr. 132.)

[5] Nocturia is defined as "excessive urination at night." Dorland's 1142.

hands. (Tr. 135-36.) He further stated that plaintiff could not regularly travel by bus or subway. (Tr. 137.)

Dr. Natta's last written statement was dated October 9, 1998. (Tr. 500.) He reported that plaintiff was being treated for degenerative joint disease (specifically sclerosis of the sacroiliac joints)[6] and latent luetic infection,[7] that he was status post-left hydrocelectomy[8] and that he suffered from kidney stones (nephrolithiasis) and Type II diabetes. He also reported that plaintiff continued to take Motrin 600 mg, Tylenol #3 and Flexeril. He reiterated, however, that plaintiff was "unable to work in any capacity." (Tr. 500.)

Plaintiff was also treated in 1997 by Dr. Joerg Bose for a case of major depression with dysthymic disorder,[9] which Dr. Bose characterized as moderate to severe. (Tr. 325-30.) According to the psychiatrist, Lugo presented as unmotivated and tearful. His mood

---

[6] Sclerosis involves a hardening, in this case at the joints. Dorland's 1495-96.

[7] "Luetic" means "syphilitic." Dorland's 961.

[8] A hydrocelectomy is the process of draining excess fluid, especially from the testicles or spermatic cord. Dorland's 783.

[9] This term refers to a "mood disorder characterized by depressed feeling . . . and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." Dorland's 519.

was sad and his affect restless. (Tr. 327.) Dr. Bose found plaintiff limited in his capacity for understanding and memory but not limited in the areas of sustained concentration and adaptation. (Tr. 329.)

The record also includes documents from Columbia Presbyterian Hospital for the period from March 1994 to September 1997. In March 1994, Lugo was diagnosed with a kidney stone, which caused pain, fever, some bleeding (hematuria) and fever. (Tr. 310.) He passed the stone and was discharged. In June 1994, he had a similar episode and was scheduled for a lithotripsy. (Tr. 303.) Periodic reports of a similar nature are scattered throughout plaintiff's medical records from 1994 to 1996, with reference to a lithotripsy actually having been performed in 1995 at Brooklyn Hospital. (Tr. 298, 300, 393-95.) In 1997, a radiological examination yielded a finding of "sclerosis of the sacroiliac joints bilaterally," probably indicating degenerative joint disease. (Tr. 292, 398, 465.)

The record also contains a host of reports by consulting doctors. We summarize their results in chronological order.

In March 1994, Dr. Alain DelaChapelle, a psychiatrist, conducted a mental-status examination of Lugo. He reported that

15

plaintiff was participating in an alcohol rehabilitation program and did not show any depression or psychotic symptoms. (Tr. 118.) He stated that plaintiff was hoping to "get back on his feet and return to work." The psychiatrist diagnosed alcohol dependence and suggested continuing alcohol counseling. He characterized Lugo's prognosis as "fair." (Tr. 119.)

In March 1994, Dr. A. DeLeon, an internist, examined plaintiff for the SSA. He summarized plaintiff's reported history of kidney stones ("nephrolithiasis"), arthralgia of the neck and back, alcoholism and histories of drug abuse and depression. (Tr. 120.) He then summarized his findings from the physical examination, stating that plaintiff could bend forward to 60 degrees and that no tenderness or muscle spasm was observed at L3-L4 in the lumbar spine. (Tr. 121.) A follow-up x-ray of the cervical spine was found to be normal. (Tr. 123.) Dr. DeLeon found that plaintiff could sit without limitation and was only "slightly limited" in other exertional activities. (Tr. 122.) He offered a prognosis of "fair." (Tr. 122.)

On January 5, 1995 plaintiff underwent a consultative physical examination by Dr. Howard Finger, an internist (Tr. 124-26), and another psychiatric examination by Dr. DelaChappelle. (Tr. 116-17.) Dr. Finger mentioned depression and reported that plaintiff had

said that he had difficulty sleeping. He stated that plaintiff had reported that he had stopped drinking and using cocaine in the last one to two years. He also noted plaintiff's complaint of kidney stones and back and neck pain. (Tr. 124.)

Based on his physical examination of Lugo, Dr. Finger stated that Lugo's straight leg raising was negative to sixty degrees. Plaintiff reported diffuse low-back pain on flexion of the lumbar spine past seventy to eighty degrees, but the range of motion in his cervical spine was normal. The doctor noted no muscle spasm, although he observed that plaintiff's gait was slow. He determined that Lugo's lower extremity strength and grip strength were reduced to 4+/5 bilaterally. (Tr. 125.) Finally, he noted that Lugo's blood tests were normal. The doctor offered a "fair" prognosis. He diagnosed a history of alcohol and cocaine abuse, a history of kidney stones, chronic low-back disorder, arthralgia of the cervical spine and a history of depression and insomnia. He noted no gross difficulties in sitting and opined that plaintiff "may be mildly limited" in other exertional activities. (Tr. 126.)

During Dr. DelaChappelle's second psychiatric evaluation, he reported Lugo's assertion that he had suffered from depression for about one year, which Lugo attributed to his medical problems. Dr. DelaChapelle observed that Lugo appeared "mildly depressed" on a

mental-status exam and was unable to do "serial sevens" accurately. (Tr. 116.) Lugo reportedly told the doctor that he stayed at home, reading or watching television, that he rarely socialized and that he relied on his wife to do most household chores. The doctor diagnosed Lugo with both cocaine abuse in remission and a depressive disorder, for which he recommended psychiatric treatment. He listed Lugo's prognosis as "fair." (Tr. 117.)

On January 7, 1998, Lugo underwent another physical examination by Dr. Finger. (Tr. 319-21.) After summarizing plaintiff's history -- including kidney stones, arthritis and low-back pain, diabetes, high blood pressure and a nervous condition, as well as drinking and drug use -- the doctor reported his physical findings. Lugo's straight leg raising was negative to sixty degrees bilaterally. He was able to flex the spine to forty fifty degrees before encountering "moderate diffuse low back pain," with no observed muscle spasm. Dr. Finger observed that plaintiff's gait was slow and mildly to moderately stiff. (Tr. 320.) Plaintiff exhibited mild crepitus[10] in the knees. The doctor estimated the strength in his lower extremities at 4+/5. (Tr. 321.)

Dr. Finger also ordered radiological studies. These revealed

---

[10] Crepitus is defined as "the crackling sound produced by the rubbing together of fragments of a fractured bone." Dorland's 391.

mild scoliosis and minimal osteoarthritis of the lumbosacral spine. (Tr. 323.) The radiological report noted "eburnative changes with both sacroiliac joints, more pronounced on the inferior aspect." (Id.)[11] Dr. Finger diagnosed chronic low-back disorder, non-insulin-dependent diabetes, arthralgias of the hands, knees and shoulders and a history of kidney stones, depression and alcohol abuse. (Tr. 321.) He further concluded that plaintiff was "mildly to moderately limited" in his ability to stand, walk, lift and carry and "mildly limited" in sitting. He opined that plaintiff's prognosis was "guarded." (Tr. 321.)

Two weeks later, plaintiff underwent another psychiatric exam by Dr. DelaChappelle. (Tr. 334-35.) Lugo reported experiencing depression, sadness, nervousness, insomnia and suicidal ideation. He also mentioned that he had been in psychiatric treatment for the prior six months with Dr. Chattah, a psychiatrist, and that he was taking Prozac and Ambien, which somewhat improved his condition.[12] (Tr. 334.)

_____

[11] This reference is to the gradual conversion of a bone into an ivory-like mass. Dorland's 524. In the case of osteoarthritis -- which appears to be plaintiff's condition, as the same exam revealed (Tr. 323) -- the bone thins and loses cartilage, "resulting in [the] exposure of the subchondral bone, which becomes denser and the surface of which becomes worn and polished." Dorland's 524.

[12] The record contains no documentation of the treatment by Dr. Chattah.

In his mental-status examination, Dr. DelaChappelle found that plaintiff was alert and cooperative and showed good eye contact. Lugo's speech was coherent and relevant, and he was neither anxious nor depressed and was not hallucinating. The doctor judged his intellectual functioning to be average and his insight and judgment to be fair. Plaintiff could also recall three of three objects in three minutes. (Tr. 334.)

Dr. DelaChappelle diagnosed Lugo with dysthymic disorder. He further found that Lugo had a satisfactory ability to understand, remember and carry out instructions, to respond appropriately to supervision and to co-workers and to deal with pressures in a work setting. He characterized Lugo's prognosis as "fair." (Tr. 335.)

Three months later, in April 1998, plaintiff underwent still another psychiatric evaluation, this time by Dr. Richard King, a psychiatrist. (Tr. 344-45.) Lugo described a history of substance abuse, although he stated that he had stopped this habit several years before. He claimed to occasionally hear voices calling his name, and he reported that he was taking Prozac and Ambien. (Tr. 344.)

Dr. King reported that, on examination, Lugo established fair rapport and exhibited no acute distress. His speech was coherent

and relevant. He was euthymic[13] and not significantly anxious or depressed. (Tr. 344.) He exhibited no hallucinations, his intellectual functioning was average and he was able to reproduce geometric shapes adequately. (Tr. 344-45.) He exhibited fair judgment and insight and adequate concentration and attention. (Tr. 345.)

Dr. King concluded that plaintiff suffered from a mild dysthymic disorder and suggested ruling out a substance-induced mood disorder. He diagnosed alcohol, cocaine and marijuana dependence, although he noted that Lugo had reported that he no longer used these substances. The doctor concluded that plaintiff had a satisfactory ability to understand, remember and carry out instructions and to respond to supervision, co-workers and workplace pressures. (Tr. 345.)

In May 1998, plaintiff underwent another physical examination by Dr. Finger. (Tr. 346-48.) The doctor reported that plaintiff's straight leg raising was negative to sixty degrees. His forward flexion of the spine reached fifty degrees with moderate diffuse mid- and low-back pain. His muscle strength in the low extremities,

---

[13] This term refers to a normal psychological state, not manic or depressed. See, e.g., Santiago v. Barnhart, 441 F. Supp. 2d 620, 624 n.3 (S.D.N.Y. 2006) (citing PDR Medical Dictionary 627 (2d ed. 2000)); accord, e.g., Wren v. Astrue, 2007 WL 1531804, at *5 n.4 (D. Kan. May 23, 2007).

as well as his grip strength, was again measured at 4+/5, and his gait was slow and stiff. He was able to get on and off the examination table without assistance, however, although he did it slowly. (Tr. 347.)

Dr. Finger ordered X-rays of plaintiff's knees, which were normal. An x-ray of his lumbosacral spine showed mild L5-S1 osteoarthritis and marked sclerosis of the sacroiliac joints bilaterally. (Tr. 349.)

Dr. Finger diagnosed plaintiff as suffering from non-insulin-dependent diabetes mellitus, arthralgias in the knees, hands and shoulders, chronic low-back disorder, a history of kidney stones, a history of drug and alcohol abuse and a history of depression. He evaluated plaintiff as mildly limited in the length of time he could sit, mildly to moderately limited in the length of time he could stand and the distance he could walk, and moderately limited in his ability to lift and carry. He evaluated Lugo's overall prognosis as "guarded." (Tr. 348.)

The record contains another residual functional capacity analysis, dated May 11, 1998, by a Dr. B. Reynolds, who apparently reviewed plaintiff's file but did not examine him. Dr. Reynolds concluded that Lugo could lift up to 20 pounds occasionally and up

to 10 pounds frequently. He further found that Lugo could stand and walk for as many as six hours in an eight-hour workday, or, alternatively, could sit for as many as six hours in an eight-hour day and do pushing and pulling while seated, including the use of hand or foot controls. He further opined that plaintiff could occasionally climb, balance, stoop, kneel or crawl. (Tr. 382-83.)

Plaintiff underwent another psychiatric evaluation in November 1998, this time by Dr. Luigi Marcuzzo, a psychiatrist. (Tr. 480-81.) Plaintiff reported long-term depression resulting from physical problems and physical abuse by his stepmother. He also reported a history of five suicide attempts, the most recent only three weeks before. He claimed to hear voices calling his name and reported low energy, poor motivation, insomnia, paranoid ideation and poor concentration. He also mentioned a history of substance abuse and said that he had entered a treatment program the prior year, that is, in 1997. He did believe that the medications he was taking were helping his depression "somewhat." (Tr. 480.)

Based on his examination, Dr. Marcuzzo described Lugo as "rather guarded and suspicious, withdrawn[] [and] tearful." Lugo's speech was limited in scope and concrete. The doctor noted no delusions, but observed some instances of paranoid ideation. Plaintiff's mood was depressed and his affect constricted. His

short-term memory was intact, but his remote memory was impaired. His attention and concentration were impaired, and he was easily distractible. His insight and judgment were fair, although he could not perform serial sevens. (Tr. 481.)

Dr. Marcuzzo offered a diagnostic impression of major depression. He also viewed Lugo's memory, understanding, sustained concentration, persistence, social interaction and adaptation as impaired. He concluded that his prognosis was "fair." (Tr. 481.)

Two days later, a consulting physician, Dr. E. Cadet, offered a medical assessment of plaintiff. He noted his impressions of plaintiff's ailments, namely depression, diffuse arthralgia and histories of kidney stones and hydrocele repair. On this basis, he opined that plaintiff met the SSI criteria for disability. (Tr. 479.)[14]

One year later, Lugo underwent a psychiatric examination by Dr. Geraldo Tapia. (Tr. 502-03.) On this occasion, plaintiff recounted that he had been mugged and shot in the shoulder eighteen years before and had suffered from nervousness ever since. He said that he was sad, sensitive to noises, feared being on the street

---

[14] It is not clear whether Dr. Cadet actually examined plaintiff or simply reviewed his medical records.

alone, stayed isolated, had difficulty sleeping and hears voices calling him. He also reported a prior history of marijuana and cocaine use. (Tr. 502.)

Dr. Tapia described plaintiff's speech as relevant and coherent. He found no thought disorder or delusions. He rated Lugo's insight and judgment as fair. (Tr. 502.)

The doctor diagnosed a dysthymic disorder and suggested the need to rule out a post-traumatic stress disorder. He evaluated Lugo as having a good ability to understand, carry out and remember instructions, and a fair ability to respond appropriately to supervision and co-workers in a work setting. (Tr. 502.)

At about the same time, plaintiff underwent a physical examination by Dr. Babu Joseph. (Tr. 507-08.) He noted that the cervical spine had a full range of motion, and that scoliosis, paraspinal muscle spasm and tenderness were not indicated. He reported that plaintiff had a lumbar ventral flexion of forty degrees and a dorsal flexion of five degrees. (Tr. 507.) An x-ray taken of Lugo's lower back in connection with the examination was normal. (Tr. 505.) Dr. Joseph diagnosed joint and low-back pain, a history of kidney stones, depression and a skin disorder. He concluded also that plaintiff was mildly limited in standing,

walking, lifting and carrying. (Tr. 508.)

The remaining two examinations in the record were both conducted on March 2, 2000. Dr. A. Cacciarelli (Tr. 533-35) reported that plaintiff complained of low-back pain, kidney problems, a skin disease and a nervous disorder. Lugo had stated to Dr. Cacciarelli that it was difficult for him to stand for more than fifteen to twenty minutes at a time, and that he could not lift or carry more than five to ten pounds. He reported also that he was taking Celebrex, Flexeril, Risperdal, Prozac and Ambien. (Tr. 533.)

Dr. Cacciarelli found that plaintiff complained of pain at 40 degrees on forward flexion. The doctor also observed eczema on plaintiff's lower extremities. He diagnosed a history of psychiatric disorder, chronic skin disease, a history of kidney stones and joint and back pain. He concluded, based on these findings, that plaintiff had "a limited ability to push, pull or carry heavy objects or stand around for long periods of time." (Tr. 535.)

Plaintiff's final psychiatric evaluation was conducted by Dr. King. (Tr. 531-32.) This time, plaintiff reiterated the incident that he had reported to Dr. Tapia, in which he had been shot

eighteen years before, and mentioned that he had been psychiatrically hospitalized at some point in the Dominican Republic. He reported having been depressed since he was shot and said that he had used cocaine and heroin in the past but had stopped around 1993. (Tr. 531.)

Dr. King indicated that during the exam, plaintiff had a fair rapport and exhibited no acute distress. His speech was relevant and coherent. According to Dr. King, he was euthymic and not notably depressed or anxious, and he exhibited no hallucinations, delusions or suicidal ideation, among other things. His intellectual functioning was average. His insight and judgment were fair, and his attention and concentration were adequate. (Tr. 531.)

Dr. King diagnosed plaintiff with mild to moderate dysthymic disorder and a history of a major depressive episode (apparently a reference to Lugo's condition when examined by Dr. Marcuzzo). He diagnosed alcohol, cocaine and marijuana dependence, although he noted plaintiff's statement that he had ended his abuse of those substances. He also found that Lugo had a satisfactory ability to understand, remember, carry out instructions, respond to supervision and co-workers and deal with pressures in a work setting. (Tr. 532.)

Dr. Anthony Danza provided the final assessment of plaintiff's exertional capacities found in the record, apparently without examining the plaintiff, on April 4, 2000.[15] Dr. Danza opined that Lugo could lift or carry as much as 50 pounds occasionally and 25 pounds frequently. He also reported that plaintiff could stand and walk for up to six hours in an eight-hour workday, and that he could, alternatively, sit for as many as six hours in a day while performing pushing and pulling, including the operation of hand or foot controls. (Tr. 523.) He further stated that Lugo could frequently climb, balance, stoop, kneel, crouch and crawl. (Tr. 524.)

C. ALJ Greenberg's November 17, 2000 Decision

As noted, ALJ Greenberg "merged" all three of Lugo's applications and considered the entire record when he issued his November 17, 2000 decision finding Lugo ineligible for SSI benefits. (Tr. 157-65.) In his decision, the ALJ applied the five-step evaluation process required by 20 C.F.R. § 416.920 (2005) to determine whether a claimant is disabled. (Tr. 158.) He first found that Lugo had not engaged in substantial gainful activity since 1991. (Tr. 158.) With regard to the severity of his impairments,

---

[15] Another physician, Dr. John Cordice, signed a concurring endorsement on Dr. Danza's assessment, on April 5, 2000. (Tr. 529.)

ALJ Greenberg began by reviewing the May 17, 1999 decision he had authored concerning Lugo's second (November 1997) application.

As summarized by the ALJ, in his 1999 decision he had found: (1) that Lugo could perform light work, lifting and carrying up to twenty pounds and standing and walking for six hours; (2) that while he had a history of kidney stones, he had tested free of kidney stones in 1997 and 1998; (3) that Lugo had non-insulin-dependent diabetes mellitus that was diet-controlled and had no systemic complications; (4) that he had "very minimal osteoarthritis in the lumbosacral spine, could flex his spine to 50 degrees with no paravertebral muscle spasm, could perform normal side bending and extension in the lumbosacral spine, and had a normal range of motion in the cervical spine," (5) that Lugo had mild crepitus in his knees with no gross swelling; (6) that he was taking Prozac and Ambien for a dysthymic disorder but had no work-related mental limitations; and (7) that Lugo had "clear" attention and concentration, could calculate and do "serial sevens" and was "fully oriented," "had no limitations in sustained concentration" and had a "satisfactory ability to interact with supervisors and co-workers and to handle work pressures." (Tr. 159.) The ALJ also noted that while Lugo had complained of daily pain in his spine due to arthritis, "no evidence was found to support a claim that this pain was disabling" since, for example, he did not require physical

therapy or need orthopedic surgery, and he had reported that he could do light household chores. (Tr. 159.)

At the August 2000 hearing, the ALJ, consistent with the District Court's remand, stated that he had sought additional evidence, particularly with regard to plaintiff's complaints of severe pain, and had reviewed "the entire body of evidence . . . related to all three applications." (Id.) The ALJ then summarized the medical evidence in the record, which included the more recent of the numerous consultative examinations as well as reports by Lugo's treating physician.

ALJ Greenberg first summarized the findings of Dr. Finger, based on his January 7 and April 21, 1998 examinations. (Tr. 159-60.) He then recited the findings from the November 11, 1999 consultative examination by Dr. Joseph, the March 2, 2000 consultative examination by Dr. Cacciarelli, the consultative psychiatric examination by Dr. DelaChapelle on January 22, 1998, the consultative psychiatric examination by Dr. Tapia on November 15, 1999, the consultative psychiatric examination by Dr. Richard King on March 2, 2000 and the medical and psychiatric evaluations by Dr. Cadet and Dr. Marcuzzo that Lugo had undergone on November 6, 1998 pursuant to his application for public assistance purposes. (Tr. 160-62.)

In addressing Dr. Marcuzzo's finding of a major depression, the ALJ noted that Lugo's condition, when examined by Dr. Marcuzzo, had differed "markedly" from his condition as described in other consultative psychiatric reports both before and after Marcuzzo's examination. (Tr. 161.) Specifically, neither Drs. DelaChapelle and Tapia in 1999, nor Dr. King in 2000, had found major depression or severe impairments in functioning, but, at most, mild to moderate impairments. (Id.) The ALJ concluded that Lugo's symptoms had "worsened temporarily" at the time of his examination by Dr. Marcuzzo, but that this did not reflect "a psychiatric condition that would last 12 months or more," since his psychiatric status, as determined by a series of examinations between January 1998 and March 2000, was "dysthymic disorder imposing mild to moderate limitations." (Tr. 162.)

ALJ Greenberg then turned to the medical reports provided by Dr. Natta, Lugo's treating physician. (Id.) In the doctor's most recent communication, a brief note in October 1998, he had opined that Lugo could not work "in any capacity," citing his Type II diabetes, his 1994 procedure to remove kidney stones, a latent luetic infection, surgery to remove hydroceles in 1997 and degenerative joint disease, including sclerosis of the sacroiliac joints with persistent low-back pain. (Id.) ALJ Greenberg observed that Dr. Natta had cited no clinical or laboratory findings or any

other support for such a degree of impairment, that he had provided no indication of the degree of limitation on Lugo's ranges of motion or ability to ambulate and that he had made "essentially the same unsupported statement on December 18, 1993." (Id.) ALJ Greenberg also cited Dr. Natta's September 1995 evaluation form, indicating that Lugo could not work because of "persistent pain, inability to stand for any length of time, and restriction of activities," and his reports from 1992 to 1998 indicating that Lugo was severely disabled and unable to work. (Id.) The ALJ observed that, despite the severity of the conditions described by Dr. Natta, there was no indication from the doctor that he had provided or recommended intensive treatment or monitoring, that he had referred Lugo for pain management, that Lugo had undergone any physical therapy or orthopedic surgery or that there had been any other attempts to provide the kind of pain relief that would have been warranted if Lugo's pain were so extreme as to prevent him from working for six years. (Id.) As a result, ALJ Greenberg gave "little weight" to Dr. Natta's opinion that Lugo was unable to work. (Id.)

Following this review of physician and psychiatrist reports, ALJ Greenberg summarized the medical evidence as showing that Lugo had a history of kidney stones, arthritis -- including back pain requiring no surgery or physical therapy -- non-insulin-dependent

diabetes without systemic complications and a dysthymic disorder. (Id.) While these impairments were "severe within the meaning of the regulations," ALJ Greenberg opined that they were not severe enough to meet or medically equal one of the impairments in Appendix 1, Subpart P, Regulations No. 4. (Id.)

The ALJ then proceeded to analyze whether Lugo retained the residual functional capacity ("RFC") to perform the requirements of his past relevant work or other work existing in significant numbers in the national economy. He considered all of Lugo's symptoms, including the extent to which they were consistent with objective medical evidence, his testimony about pain and the medical opinions, and found that Lugo's allegations about his limitations were "not credible, based on the medical evidence." (Tr. 162-63.) The ALJ concluded that there was "simply no medical support in the record" for his allegations that he has been unable to work since 1993 because of his pain and psychiatric problems, and that, based on a review of the ample evidence in the record, there was "no information concerning the claimant's physical or mental condition that differs from prior evidence of record." (Tr. 163.)

Focusing on Lugo's complaints of pain, ALJ Greenberg noted that Lugo had not been referred for physical therapy or orthopedic

33

surgery for his condition, and that while the evidence indicated that he had some pain, it was manageable with medication and was not so severe that it prevented him from working. (Id.) He found that Lugo was "employable, but [] not motivated: he is a malingerer." (Id.) Based on these facts, the ALJ concluded that Lugo retained a RFC for a "full range of light work," which was "consistent with the medical opinions discussed above" indicating "mild to moderate limitations on physical functioning and no limita[ti]ons on mental functioning." (Tr. 163.)

Proceeding along the five-step disability analysis, ALJ Greenberg found that Lugo could not return to his past relevant work as a shipping clerk, where he had lifted and carried up to fifty pounds. (Id.) With the burden shifting back to the SSA to show there were other jobs that Lugo could perform in the national economy consistent with his RFC, age (forty-seven), education and work experience, ALJ Greenberg reviewed the Medical-Vocational Guidelines, which direct a conclusion of "disabled" or "not disabled" depending on the claimant's RFC and vocational profile. (Tr. 163.) Since Lugo was a "younger individual" with limited education, the ALJ noted, the Guidelines could direct a no-disability decision only if Lugo had the exertional RFC to perform the seven primary strength demands at the given level of exertion and if there were no non-exertional limitations. (Id.) He explained

that jobs were classified as sedentary, light, medium, heavy and very heavy and described the exertional demands of light work: lifting no more than twenty pounds with frequent lifting or carrying of ten pounds, a "good deal" of walking, and standing or sitting most of the time with some pushing and pulling. (Tr. 164.) He concluded, "Because the evidence supports a finding that the claimant can perform the demands of the full range of light work, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.16." (Id.)

### D. The Parties' Motions

In the Commissioner's moving brief, he seeks an order reversing this decision and remanding the case to the SSA for further proceedings, both to allow further development of the record and to permit the ALJ to provide more detailed findings on several issues. In support of this application, the Commissioner cites two major errors in the ALJ's decision.

The first error concerns how the ALJ arrived at his conclusion that the plaintiff was able to perform light work. That term is defined in 20 C.F.R. § 416.967(b) as the ability (a) to lift up to ten pounds frequently and up to twenty pounds occasionally, and (b) either to stand and walk, off and on, for a substantial amount of

time, or to sit for most of the time coupled with the ability to do pushing and pulling of arm or leg controls. See, e.g., Vargas v. Sullivan, 898 F.2d 293, 294 (2d Cir. 1990);[16] see also Titles II and XVI, Determining Capability to do Other Work -- the Medical-Vocational Rules of Appendix 2, 1983-1991 Soc. Sec. Rep. Serv. 24 (SSR 83-10), available at 1983 WL 31251, at *5-6 (1983).[17] Because the record contained "widely varied assessments" of Lugo's ability

---

[16] The regulation states:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls. To be considered capable of performing a full or wide range of of light work, you must have the ability to substantially all of these activities.

20 C.F.R. 416.9267(b).

[17] The explanatory statement found in SSR 83-10 is confusing in explaining the standing and walking requirements of the cited regulation. It first states that this portion of the regulation requires "frequent lifting or carrying of objects" -- which it notes implies a requirement for extended standing or walking -- and it defines "frequent" as "occurring from one-third to two-thirds of the time." It then goes on, however, to state that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." If, however, "frequent" means "one-third to two-thirds of the time," one might expect a standing/walking requirement of about two and one-half to five hours, but SSA does not address this apparent anomaly. In any event, as noted, light work is defined, alternatively, to encompass mostly sitting if accompanied by a sufficient amount of pushing or pulling with the use of arm or leg controls to a greater degree than required for sedentary work.

to perform these activities, and because the ALJ did not explain "how he weighed the medical evidence and medical opinions in the record to arrive at his conclusion," the Commissioner seeks remand to correct this error. (See Def.'s Mem. 3-4, 6.)

As examples of the "varied assessments," the Commissioner cites not only the reports considered by ALJ Greenberg (including those of Drs. Natta, Finger and Cacciarelli), but also a number of reports not cited by the ALJ that directly addressed the quantifiable physical exertion requirements, including a March 1994 report by Dr. DeLeon (finding no limitation in Lugo's ability to sit, but slight limitation regarding standing, walking, lifting, carrying, pushing and pulling (Tr. 122)); a January 1998 report by Dr. Mason (finding Lugo able to handle twenty-five pounds frequently and fifty pounds occasionally and able to stand or walk for six hours in an eight-hour day (Tr. 337)); a May 1998 report by Dr. Reynolds (finding that Lugo could handle ten pounds frequently and twenty pounds occasionally and that he could stand or walk for six hours in an eight-hour day (Tr. 382)); a November 1999 report by Dr. Joseph (finding that Lugo had no sitting limitation and mild restrictions in prolonged walking, standing and handling heavy objects (Tr. 508)); and a December 1999 report by Dr. Danza (finding that Lugo was able to handle twenty-five pounds frequently and fifty pounds occasionally and that he could stand or walk for

six hours (Tr. 523)). (Def.'s Mem. 4-5.) The Commissioner suggests that these reports need to be reconciled with the ALJ's findings. (Id. at 3-6.)

The Commissioner also argues that the ALJ erred with respect to Lugo's mental impairments: noting that Dr. Marcuzzo's opinion that Lugo was impaired for all types of mental functioning was inconsistent with that of the other psychiatrists, the Commissioner points out that the ALJ made "inconsistent statements about the severity of the limitations indicated by the other psychiatrists." (Id. at 7-8.) The Commissioner observes that at one point the ALJ stated that Lugo had mild to moderate limitations in his mental functioning (Tr. 161-62), but elsewhere in his decision he wrote that Lugo had "no limita[ti]ons on mental functioning" (Tr. 163), and he failed to explain or reconcile these two seemingly inconsistent findings. (Def.'s Mem. 7-8.)

The Commissioner points out that an accurate assessment of the severity of the limitations on Lugo's mental functioning was particularly important because of his "long history of substance abuse," as the statute and regulations provide that an individual cannot be found disabled if it is determined that alcoholism or substance abuse was material to the finding of disability. (Def.'s Mem. 8 (citing 42 U.S.C. § 1382c(a)(3)(J)).) In this regard, the

Commissioner notes the inconsistent statements made by Lugo throughout the record as to when he stopped abusing cocaine and alcohol -- dates that ranged from 1992 to 1997. (Def.'s Mem. 8.) According to the Commissioner, even if Lugo's mental impairments were severe enough to prevent him from working, before he could be found disabled it would still be necessary to evaluate the evidence to determine whether Lugo would still be disabled if he had stopped using drugs or alcohol. Since the ALJ did not address this question, the issue could only be resolved on remand. (Id. at 8-9, Def.'s Reply Mem. in Further Supp. of Her Mot. for a Remand and in Opp'n to Pl.'s Cross-Mot. 5-6.)

Plaintiff in turn filed a cross-motion for judgment on the pleadings, seeking a reversal of the Commissioner's decision and a remand solely for the purpose of awarding benefits. In his brief, Lugo first argues that reversal and payment of benefits is the appropriate remedy because substantial evidence in the record supports a finding that he is disabled pursuant to the statute. (Pl.'s Mem. 17-23.) Specifically, he contends that every physician who treated or examined him concluded that he has "functional limitations" from low-back pain. (Id. at 17.) Lugo maintains that Dr. Natta's findings that he had substantial limitations were not an aberration, given Dr. DeLeon's opinion that he was "slightly limited" in his ability to walk, stand, lift, carry, push and pull;

Dr. Finger's opinion that he was mildly to moderately limited; and Dr. Cacciarelli's opinion that he was "limited" in those abilities. (Id. at 18-19.) Against that backdrop, Lugo argues that his treating physician's opinion should have been accorded "controlling weight," as it was "not inconsistent" with other substantial medical evidence of record; according to plaintiff, even though Dr. Natta's conclusion was not "100% consistent" with the other evidence, it did not have to be. (Id. at 19-20.) He also infers that one reason why the consulting physicians might not have regarded Lugo's limitations as so severe is because they failed to look for lumbosacral tenderness. (Id. at 20.) If Dr. Natta's opinions had been given controlling weight, Lugo claims, he would have been found disabled. (Id. at 20.)

Lugo also argues that the ALJ failed to provide specific reasons for discrediting his testimony concerning pain and that his subjective complaints of pain should have been fully credited. If so, this would have resulted in a finding of disability. (Id. at 21-23.)

Finally, Lugo argues that reversal, not remand, is appropriate in his case because his claim for benefits is more than ten years old, and that the Commissioner should not be accorded another opportunity to "shore up" his determination that plaintiff is not

disabled, particularly since the ALJ, Appeals Council and Commissioner have ignored the District Court's 1998 order directing the SSA to follow the regulations if Lugo's testimony was to be discredited. (<u>Id.</u> at 23-24.)

In his Reply Memorandum, the Commissioner responds that delay alone is never a sufficient basis for reversing a decision and awarding benefits. (Def.'s Reply Mem. 2.) In addition, the Commissioner argues that remand for calculation of benefits is appropriate only where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose" (<u>id.</u>) (quoting <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980), and that the medical evidence here is not so clear as to warrant such a conclusion, given the "numerous conflicting assessments of the severity of the functional limitations arising from those conditions." (<u>Id.</u> at 4-5.) Finally, the Commissioner reiterates that even if the medical evidence clearly showed that Lugo could not perform any substantial gainful activity, it would still be necessary to determine whether his history of alcohol and drug abuse was material to the finding of disability in light of the conflicting evidence as to when he stopped abusing those substances. (<u>Id.</u> at 5-6.)

## DISCUSSION

I.    Standards for Review and Remand


For purposes of SSI eligibility, a person is disabled when he is unable to "engage in any substantial gainful activity[18] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(B); see also 20 C.F.R. § 416.905 (footnote not in original). A person's physical or mental impairment is not considered disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir.

---

[18] Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 416.910.

42

1988).

The regulations set forth a five-step sequential process to evaluate disability claims. 20 C.F.R. §§ 404.1520, 416.920. The first step requires the ALJ to determine whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, he is not considered disabled; if not, Step Two requires the ALJ to determine whether the claimant has a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from a severe impairment, Step Three requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 404.1520(d)-(e), 416.920(d)-(e). If the claimant's impairment meets or equals a listed impairment, the claimant is presumptively disabled; if the claimant is not presumptively disabled, Step Four requires the ALJ to consider whether the claimant's residual functional capacity ("RFC")[19] precludes the performance of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the ALJ so finds, Step Five requires the ALJ to determine whether the claimant can do any other work. 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant retains the burden

---

[19] RFC is defined as the most a claimant can do, despite limitations. In determining a claimant's RFC, all medically determinable impairments will be considered, including those that do not qualify as "severe". 20 C.F.R. § 416.945(a).

of proof as to the first four steps, and the Commissioner bears the burden of proving the fifth step. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

The Social Security Act authorizes the court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of the statute:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgement affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g); Butts, 388 F.3d at 384. Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999) (internal quotation marks omitted) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)); cf. Butts, 388 F.3d at 384. Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117 (2d Cir. 2000)).

In considering whether a remand is appropriate, the court

looks to whether the ALJ complied with his affirmative duty to fully develop the record, which applies even when a claimant is represented at the hearing. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). To that end, the ALJ must seek additional evidence or clarification when the "report from [the applicant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1); see also Rosa, 168 F.3d at 79 (describing the ALJ's obligation to develop the record). In addition, the ALJ must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests and must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984); Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006).

If the ALJ failed in his duty to fully develop the record or committed other legal error, a reviewing court

> should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence. If, on the other hand, the district court determines that there is substantial evidence of disability in the administrative record, it may decide to reverse the

> Commissioner's decision, make a determination of
> disability and remand solely for the calculation
> of benefits. Such a remedy is an extraordinary
> action and is proper only when further
> development of the record would serve no
> purpose.

Rivera v. Barnhart, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005).

In short, a remand solely for an award of benefits may be justified if the court finds that the Commissioner's decision was not based on substantial evidence and that further development of the record would not change that result. Id. at 604. Delay alone, however, is not a valid basis for remand solely for calculation of benefits. See Bush v. Shalala, 94 F.3d 40, 46 (2d Cir. 1996) (citation omitted).

II.   Assessment of Defendant's Motion

The SSA seeks a remand to correct several identified errors of the ALJ. We address these errors and several others that warrant a remand unless there is a basis in the record to order an outright award of benefits.

A. The ALJ's Conclusion that Plaintiff
   Could Perform Light Work

The Commissioner asserts that the ALJ did not adequately explain how he weighed the medical evidence and medical opinions

and arrived at his conclusion that the plaintiff was able to perform light work, particularly given the "widely varied assessments" of Lugo's ability to perform these activities. (Def.'s Mem. 4.) He argues that this error compels remand. We agree.

"It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions." Pacheco v. Barnhart, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (internal quotation marks omitted) (quoting Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). Courts in this Circuit have long held that an ALJ's "failure to acknowledge relevant evidence or explain its implicit rejection is plain error." Kuleszo F/K/A Dillon v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002). Although "every conflict in a record [need not be] reconciled by the ALJ . . . the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris, 728 F.2d at 587.

While the ALJ stated that he had reviewed "the entire body of evidence" in the record, his decision cited the findings of only a small number of the consultative physicians on the question of Lugo's physical limitations. (Tr. 159.) Further, none of those

cited had provided an opinion on Lugo's RFC that quantified how long Lugo could sit or walk, and how much he could lift, findings that would form the basis for a determination of whether a claimant can perform sedentary, light, medium, heavy or very heavy work. (Tr. 159-60.) The ALJ cited two assessments by Dr. Finger, who found Lugo "mildly" limited in sitting, "mildly to moderately" limited in standing and walking and "moderately" limited in lifting and carrying; an assessment by Dr. Joseph, who found that Lugo had "mild" restrictions on walking and prolonged standing, no limitation on sitting and "mild" restrictions on carrying and lifting heavy objects; and an assessment by Dr. Cacciarelli, who found that Lugo had a "limited" ability to push, pull or carry heavy objects or stand for long periods of time. (Id.) However, it is not clear from the ALJ's decision how these doctors' assessments of "mild" or "moderate" limitations corresponded with the SSA physical-exertion requirements for light work. Moreover, the three cited doctors differed among themselves as to Lugo's limitations, and it was far from clear whether the use of the word "mild" to describe Lugo's limitations by Drs. Finger and Joseph meant the same thing. While the ALJ did explain the basis for according little weight to the opinion of Dr. Natta -- who claimed that plaintiff was "unable to work in any capacity" (Tr. 162) -- he apparently used the general and unquantified assessments by Drs. Finger, Joseph, and Cacciarelli to conclude that plaintiff could

meet the physical requirements of light work. Moreover, he did not mention, assess or reconcile the reports of other doctors in the record -- including Drs. DeLeon, Mason, Reynolds and Danza -- who did quantify Lugo's exertional capacities.[20]

It is true that we might infer that the conclusions reached by the physicians in the record who quantified Lugo's limitations were not significantly different from the reports, for example, of Dr. Finger, who found mild, mild to moderate, and moderate limitations in Lugo's exertional requirements. (Tr. 159-60.) Nonetheless, we may not fill in the blanks of the ALJ's reasoning where it is not explicit and on that basis "affirm the ALJ's ruling based upon reasoning attributed to [him] on review but not identified in [his] opinion." (Tr. 216); <u>Lugo v. Apfel</u>, 97 Civ. 4942 (S.D.N.Y. Sept. 28, 1998) (JSR) at 3; <u>see</u>, <u>e.g.</u>, <u>Williams</u>, 859 F.2d at 260-61; <u>Rivera</u>, 771 F. Supp. at 1354.

The ALJ similarly did not explain how he weighed the functional-capacity assessments that he noted and those that he did

---

[20] We do note that Drs. Mason, Reynolds and Danza reviewed plaintiff's medical records but did not examine him. The assessments of such non-examining doctors are entitled to less weight than the findings of treating or examining doctors. 20 C.F.R. § 404.1527(d)(1); <u>see</u>, <u>e.g.</u>, <u>Campagna v. Barnhart</u>, 2007 WL 1020743, at *5 (D. Conn. Apr. 3, 2007); <u>Rivera v. Barnhart</u>, 423 F. Supp. 2d 271, 278 (S.D.N.Y. 2006); <u>Steficek v. Barnhart</u>, 462 F. Supp. 2d 415, 419 n.4 (W.D.N.Y. 2006).

not specifically evaluate, despite the centrality of those assessments to the question of plaintiff's exertional capacity. "[W]here the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." Butts, 388 F.3d at 385. Accordingly, this omission justifies a remand for further proceedings to permit the ALJ to specify how he weighed the medical evidence presented, especially the medical evaluators' quantification of Lugo's RFC, and to explain how he evaluates those varied assessments to arrive at his determination of Lugo's RFC.

2. Plaintiff's Mental Impairments

The Commissioner also points out that in assessing the limitations in Lugo's mental functioning, the ALJ arrived at two inconsistent findings in the body of his decision and did not explain or reconcile them. At one point, after reviewing the reports of psychiatrists DelaChapelle, Tapia and King, the ALJ found that Lugo's "overall psychiatric status from January, 1998 to March 2000 was a dysthymic disorder imposing mild to moderate limitations." (Tr. 162 (emphasis added).) The ALJ explained that these psychiatrists had examined Lugo both before and after Dr. Marcuzzo and found, at most, "mild to moderate impairments," in contrast to the "major depression" and other serious mental

impairments found by Dr. Marcuzzo. The ALJ explained this variance by characterizing Lugo's condition as having "worsened temporarily" when he saw Marcuzzo. (Tr. 161-62.)

The ALJ went on to evaluate Lugo's assertions concerning his psychiatric problems, and found that there was "simply no medical support in the record for these allegations." (Tr. 163.) In doing so, the ALJ did not explain how he arrived at the conclusion in the next paragraph that Lugo retained a RFC for the full range of light work based on his having mild to moderate limitations on physical functioning and "<u>no limita[ti]ons</u> on mental functioning." (<u>Id.</u> (emphasis added).)

This inconsistency is potentially critical in terms of the disability analysis. Mental limitations are considered "nonexertional" for purposes of the fifth step in the disability analysis, <u>see</u> 20 C.F.R. § 416.969a(c)(1)(i)-(ii),[21] and, if present, preclude the ALJ's exclusive reliance (as was the case here) on the medical-vocational (or grid) guidelines to dictate whether the applicant is disabled. <u>See</u>, <u>e.g.</u>, <u>Butts</u>, 388 F.3d at 383-84.

---

[21] Pursuant to 20 C.F.R. § 416.969a(c)(1)(i) and (ii), non-exertional limitations include "difficulty functioning because you are nervous, anxious or depressed" or "difficulty maintaining attention or concentration."

Despite the ALJ's reference in his decision to "mild to moderate" limitations in Lugo's mental functioning, he then ignored that finding, stating instead that Lugo had no such limitations. (Tr. 163.) This allowed him to rely exclusively on the grid regulations and to decide that "[b]ased on an exertional capacity for light work, and the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.16." (Tr. 165.)

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." Rosa, 168 F.3d at 78 (internal quotation marks omitted) (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)). However, exclusive reliance on the grids is inappropriate where

> the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform. In these circumstances, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.

Id. (internal quotation marks omitted) (quoting Bapp, 802 F.2d at 603).

By seemingly concluding that Lugo's limitations were solely exertional in nature, the ALJ dispensed with the requirement that

he consult a vocational expert or look for equivalent evidence. Instead, he made his "not disabled" determination solely by consulting "the Social Security Act's table of medical-vocational guidelines, . . . to conclude that [Lugo] was capable of performing other jobs existing in significant numbers in the national economy and therefore did not meet the requirements for disability status." Butts, 388 F.3d at 382; (Tr. 165). By not reconciling his contradictory statements concerning Lugo's limitations on his mental functioning, the ALJ made it impossible for the court to evaluate the role that Lugo's non-exertional limitations (or lack thereof) played or should have played in the ALJ's conclusion that Lugo was not disabled. See, e.g., Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983) ("[I]t is an elementary rule that the propriety of agency action must be evaluated on the basis of stated reasons.").

Furthermore, even the ALJ's alternative finding of "mild to moderate" mental impairments -- which arguably reflect an impairment that is not "significant," Rosa, 168 F.3d at 78 -- cannot stand without further explanation. As noted, Dr. Marcuzzo found that plaintiff was suffering from a "major depression." Although the ALJ opined that the psychiatrist was observing only a transient phenomenon -- thus implicitly crediting Dr. Marcuzzo's findings -- that determination of transience in a major depression

appears to be a medical assessment calling for medical expertise and hence could not be invoked by the ALJ based solely on his lay inference. See, e.g., Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who" submitted an opinion to or testified before him.) (internal quotation marks omitted) (quoting McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)); Filocomo v. Chater, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) (stating that by re-evaluating a doctor's conclusions, the ALJ improperly "engaged in his own evaluations of the medical findings").

In sum, because of limitations in the ALJ's analysis and explanations, as well as an apparent gap in the medical record, we are unable to perform a proper review of the ALJ's findings in this respect. It follows that in this case, "further findings would [ ] plainly help to assure the proper disposition of [the] claim," Rosa, 168 F.3d at 83, and we believe that remand would be "particularly appropriate" to clarify this matter. Id.; see also Clark v. Barnhart, 2003 WL 22139777, at *2 (E.D.N.Y. Sept. 16, 2003) ("Because of the inconsistent findings by the ALJ, remand is

required for a definitive determination as to whether [claimant] is or is not disabled. . . .").

### 3. The Role of Alcoholism and Drug Abuse

The Commissioner also notes that the ALJ never addressed the role that alcoholism and drug abuse played in Lugo's disability determination. As he points out, even if the ALJ found plaintiff to be disabled, he could not award benefits without first addressing the impact of such substance abuse, and for this reason a remand rather than an award of benefits is appropriate. (Def.'s Mem. 8-9, Def.'s Reply Mem. 5-6.)[22]

"[A] person found to be disabled after employment of the five-step sequential evaluation will not be considered disabled within the meaning of the Act 'if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to' a finding of disability." Orr v. Barnhart, 375 F. Supp. 2d 193, 200 (W.D.N.Y. 2005) (quoting 42 U.S.C. § 423(d)(2)(C)). The regulations make clear that the "key factor" in this analysis is whether the Commissioner would still find the claimant disabled if he stopped

_____

[22] Plaintiff does not directly address this question in his memorandum of law, suggesting instead that the evidence demonstrates that he is disabled as a result of his physical limitations, thus compelling an award of benefits without reference to his psychological status. (Pl.'s Mem. 23 n.21.)

using alcohol or drugs. <u>See</u> 20 C.F.R. §§ 404.1535(b)(1)-(2); 416.935(b)(1)-(2). "When the record contains medical evidence of substance abuse, the Commissioner should evaluate which of the claimant's 'current physical and mental limitations . . . would remain if [he] stopped using drugs or alcohol and then determine whether any or all of [these] remaining limitations would be disabling.'" <u>Eltayyeb v. Barnhart</u>, 2003 WL 22888801, at *4 (S.D.N.Y. Dec. 8, 2003) (alterations in original) (quoting 20 C.F.R. § 404.1535(b)(2) (2003)).

> If the remaining limitations would not be disabling, then drug addiction or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535(b)(2)(i). When the record reflects drug or alcohol abuse, the claimant bears the burden of proving that substance abuse is not a contributing factor material to the disability determination.

<u>Id.</u>

The ALJ found that Lugo's mental impairments were not sufficiently severe to prevent him from working, warranting a finding that Lugo was not disabled. Hence, he never addressed the question of the effect of alcoholism or drug addiction on Lugo's condition. If, however, the ALJ determined on remand that Lugo became disabled at any relevant time, he would be required to consider the effects of Lugo's alcoholism and drug use on his impairments and limitations. Lugo consistently indicated that his

abuse of these substances had been longstanding, which would underscore the need for the ALJ to elicit evidence concerning their effect on Lugo's mental status. (See Tr. 118 (heavy drinker since the age of 15); 120 (admitted to snorting cocaine for 10 years); 124 (history of alcohol abuse since his adolescence; used cocaine in the past also); 319 (admitted he was a heavy drinker and cocaine abuser for many years); 334 ("prior history of cocaine abuse for several years"); 480 (admitted to drinking heavily and using cocaine and marijuana for 10 years); 502 (cocaine and marijuana use for 15 years); 531 (alcohol and marijuana dependence since adolescence; cocaine use since age 30).)

Moreover, depending on when the disability began, the assessment could be complicated by the fact that the record provides contradictory statements by Lugo as to when he discontinued abusing these substances. The record as it stands leaves the unanswered question whether Lugo may have been abusing these substances during at least some of the period for which he is seeking SSI benefits and what effect that continued use had on his psychiatric evaluations and the conclusions drawn from them. (See Tr. 28 (last used cocaine and alcohol in 1992); 118-20 (still drinking in March 1994 and stopped using cocaine in February 1994); 124 (stopped using cocaine and alcohol in 1993 or 1994); 319 (stopped using alcohol in 1995 and cocaine in 1991); 334 (stopped

using cocaine in 1995); 480 (stopped using alcohol, cocaine and marijuana in 1997); 502 (stopped using cocaine in 1995); 531 (stopped using alcohol and marijuana in 1997 and cocaine in 1993).)[23] If the timing of the dependency became relevant, the ALJ would have to make the pertinent findings on this point.

4. <u>The ALJ's Assessment of Pain</u>

Apart from the issues that defendant flags as justifying a remand, we note an additional problem with the findings of the ALJ. In making a disability determination, the ALJ must take into account the claimant's assertions of disabling pain, even if the claim is premised on subjective symptoms, so long as the evidence establishes that the claimant has a medical impairment that could "reasonably be expected to produce pain." <u>See</u>, <u>e.g.</u>, <u>Snell v. Apfel</u>, 177 F.3d 128, 135 (2d Cir. 1999). The ALJ is of course free to discount such testimony if he finds it not to be credible, but in assessing that credibility question he must consider a variety of factors specified in the SSA regulations, and consistent with the general requirement for a clear explanation of his analysis, he must sufficiently articulate his reasoning to demonstrate his

_____

[23] Note that plaintiff generally frames these estimates in terms of number of years prior to the examination rather than naming a particular year (e.g., "three years ago" rather than "in 1995"); therefore, the dates that we extrapolate are frequently based on a calculation.

compliance with the regulation. See, e.g., Bush, 94 F.3d at 46 n.4. In assessing claims of pain, the ALJ must consider the claimant's daily activities; the location, duration, frequency and intensity of the pain; any precipitating and aggravating factors; the claimant's medications (including type, dosage, effectiveness and side effects); treatments other than medication that claimant uses to relieve pain; any other measures used to relieve pain; and any other factors concerning functional limitations and restrictions due to pain. See 20 C.F.R. § 404.1529(c)(3).

In this case, the ALJ, when addressing pain, mentioned but did not evaluate Lugo's medication regime, referred to Lugo's attempts to do light housework and cited the lack of physical therapy or surgery. He erred in failing to discuss most of the regulatory factors and in failing concretely to address evidence supportive of plaintiff's claim. Thus, he did not directly assess plaintiff's detailed descriptions of the pain and the limitations it imposed on his activities -- although he concluded that Lugo was not credible -- and he failed to address the seeming consistency of the symptoms described by Lugo with the conceded diagnoses of both treating and consulting physicians that he suffers from low-back sclerosis. Furthermore, his reference to the absence of alternative treatment measures -- specifically, physical therapy and surgery -- appears to have usurped the role of doctors in proffering expert opinions,

since the record does not demonstrate (as the ALJ assumed) that plaintiff's diagnosed sclerosis condition could be alleviated by either therapy or surgery.

While the ALJ is permitted to reject subjective testimony concerning pain for lack of credibility, he must provide an explicit and sufficient explanation so that the decision can be reviewed by the court for legitimacy of reasoning and sufficient evidentiary support. See, e.g., Williams, 859 F.2d at 260-61; Rivera, 771 F. Supp. at 1356 n.8; Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987). Particularly since the principal rationale of the plaintiff's disability claim, as reflected in Dr. Natta's reports, is his assertion that he suffers from disabling pain, the failure of the ALJ to lay out a detailed assessment explaining his rejection of plaintiff's claim requires a remand for correction of this omission.

B.    Remand for Benefits Is Not Appropriate

1. The Current Record Does not Compel a Benefit Award

In plaintiff's cross-motion, he argues that reversal and remand for payment of benefits is appropriate because substantial evidence in the record supports a finding that he is disabled. (Pl.'s Mem. 17-23.) He suggests that every doctor who examined him

concluded that he had some functional limitations due to low-back pain, and he focuses on the reports from his treating physician, Dr. Natta, who found that his pain placed serious limitations on his activities. (<u>Id.</u> at 17-18.) He argues that Dr. Natta's findings "were not an aberration," were "well-supported" by his clinical observations and later X-rays and, though not "100% consistent" with the reports of other consulting physicians, did not have to be. (<u>Id.</u> at 18-19.) Finally, he claims that if Dr. Natta's opinions were given the "controlling weight" they deserved, a finding of disability would be mandatory. (<u>Id.</u> at 20.)

In a proceeding to review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. <u>See</u>, <u>e.g.</u>, <u>Curry</u>, 209 F.3d at 122. Necessarily, then, in seeking a remand solely to calculate benefits, Lugo must demonstrate that the record so clearly supports his claim of disability that a remand for further consideration of that question would serve no purpose. <u>See</u>, <u>e.g.</u>, <u>Butts</u>, 388 F.3d at 385-86 (quoting <u>Rosa</u>, 168 F.3d at 83). Plaintiff fails to make that case.

Lugo bases his argument primarily on the contention that the ALJ erred in not according the reports of his treating physician, Dr. Natta, controlling weight pursuant to the treating physician's

rule. The "treating physician rule" is embodied in a series of provisions found in 20 C.F.R. § 404.1527, which details the weight to be accorded a treating physician's opinion and the opinions of non-treating consulting doctors. The treating doctor's opinions are entitled to "controlling weight" in certain specified circumstances:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003). The regulations further specify that if the SSA does not give controlling weight to the opinions of the treating physician, it must consider a series of specified factors in determining the weight to be given those opinions: (1) the length of the treatment relationship and the frequency of examination, with a treating physician's opinion being given more weight; (2) the nature and extent of the treatment relationship, with a treating physician's opinion being given more weight; (3) the evidence that supports the physician's report; (4) how consistent the opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factor that may be significant. 20

C.F.R. §§ 404.1527(d)(2)-(6).

The ALJ found that Dr. Natta's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and were "inconsistent with the other substantial evidence" in the record. We find that the ALJ's conclusions in this respect -- although not mandated by the record -- are supported by substantial evidence.

The most recent submission of Dr. Natta consisted of a one-page letter dated October 9, 1998 in which he asserted that Lugo was "being treated at this facility" for "degenerative joint disease -- sclerosis of the sacroiliac joints" with persistent low-back pain; that Lugo had a latent luetic infection and type II diabetes; and that he had undergone surgery to remove kidney stones in 1994 and surgery to remove hydroceles in 1997. He also reported that Lugo's medications included Tylenol #3 and Flexeril. He concluded that Lugo "is unable to work in any capacity" (Tr. 500), but provided no "medically acceptable clinical and laboratory diagnostic techniques" to support that statement.

The other records from Dr. Natta date from 1993 and 1995. (Tr. 128-39.) They consist principally of doctor's notes indicating that Lugo had "tenderness" in his lumbar spine (Tr. 129), which was

apparently diagnosed as "lumbago. R/O [rule out] osteoarthritis of lumbar spine." (Tr. 131.) He also provided a medical report in 1995 in which he indicated that he was then treating Lugo every three months (Tr. 133), and he offered a "poor" prognosis due to back pain that had persisted and was not controlled by analgesics. (Tr. 134.)[24] In that report, he estimated that Lugo could sit for up to one-half hour to an hour continuously, and stand for a total of one hour in an eight-hour day and sit for a total of one hour in an eight-hour day; that he could "never" lift or carry any weight, and "never" bend, squat, climb or reach; and that he was "unable to work with persistent pain only partly relieved by analgesics." (Tr. 135-37.)

The ALJ's analysis, at least in general terms, followed the contours mandated by the "treating physician" regulation. He observed that Dr. Natta had "report[ed] no clinical or laboratory findings or any other support for such a degree of impairment" (Tr. 162), and that finding is clearly supported by substantial evidence. Although the ALJ did not make a specific finding that Dr. Natta's conclusions were "inconsistent with the other substantial evidence" in the record, he specifically referred to a series of findings by a number of other doctors who found, contrary to Dr.

---

[24] Natta also referred to plaintiff having undergone a lithotripsy. (Tr. 134.)

Natta's reports, only mild or moderate limitations. He apparently concluded, based on this discrepancy, that Lugo was capable of substantially greater exertional activity than Dr. Natta had suggested. (Tr. 159-60.)

Given the substantial body of medical opinion rejecting the conclusions of the one treating or examining doctor who has unequivocally opined that plaintiff was physically unable to perform work activities,[25] it cannot be said that the evidence of record so clearly points to a physically disabling condition as to justify a judicially mandated award of benefits. See, e.g., Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Snell, 177 F.3d at 133. As for plaintiff's psychiatric condition, as we have noted, there is conflicting evidence in the record as to whether Lugo was suffering from an ongoing severe impairment, and the ALJ failed to offer a consistent and clear set of findings about that condition. This omission mandates a remand, but does not -- on the current state of the record, and especially given the confusion about plaintiff's substance abuse -- justify an award of benefits at this stage.

As noted, a remand for calculation of benefits is required

_____

[25] Although Dr. Cadet also stated that Lugo was disabled, it does not appear that he examined plaintiff. (Tr. 479.)

when the court finds that there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision." <u>Butts</u>, 388 F.3d at 385-86 (quoting <u>Rosa</u>, 168 F.3d at 83); <u>see also</u> <u>Parker</u>, 626 F.2d at 235 (remand for the calculation of benefits is appropriate where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose"). Because the administrative record and the findings of the ALJ contain significant gaps and further findings will "plainly help to assure the proper disposition of [the] claim," <u>Rosa</u>, 168 F.3d at 83, and because it is entirely possible that a complete record would justify the SSA's current conclusion that plaintiff was not disabled at the relevant time, remand for calculation of benefits is not appropriate here. A more complete record, explicit discussion of the weight accorded by the ALJ to the varying assessments of Lugo's functional limitations, clarification of his findings concerning Lugo's mental limitations, more specific findings as to pain and exploration of the relationship between Lugo's substance abuse and his mental limitations are necessary to -- once and for all -- make a final determination in this case.

### 3. Extensive Delay Does Not Justify An Award of Benefits

Plaintiff also asserts that the "extensive delay in the

66

adjudication of Mr. Lugo's claim is extraordinary and would, if standing alone, seriously test[] the Second Circuit's pronouncement in <u>Bush v. Shalala</u>, that delay alone is not grounds for reversal and payment [of] benefits." (Pl.'s Mem. 1.) In <u>Bush</u>, the Second Circuit held that "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." 94 F.3d at 46. It is uncontroverted that Lugo's three applications have been denied at every level of the administrative process. Moreover, the District Court's remand in 1998 and the recommended remand in this instance do not reflect on the merits of Lugo's applications, but rather are directed principally to the failings of the ALJ in not explaining the basis of his findings. We recommend that the court decline Lugo's invitation to extend the holding of <u>Bush</u> to rule that even if the ALJ finds a claimant not disabled and there is substantial evidence to support that finding, the delay in resolution is a sufficient basis to remand for benefits.


III.  <u>Time Limit for Remand</u>


There remains the question of whether a remand order may and should impose a time limit for the SSA to complete all further proceedings in this case. We conclude with an affirmative answer on both counts.

67

The Second Circuit has noted the authority of the court to require, in appropriate circumstances, that the agency adhere to a timetable on remand. The Court noted that 42 U.S.C. § 405(b) provides that

> after an adverse decision on a disability claim, a claimant is entitled to "reasonable notice and opportunity for a hearing with respect to such decision." 42 U.S.C. § 405(b)(1). We have interpreted footnote 33 of [Heckler v.] Day, [467 U.S. 104 (1984)] to mean that injunctive relief would still be an appropriate remedy for individual cases involving unreasonable delays.

Butts v. Barnhart, 416 F.3d 101, 105 (2d Cir. 2004) (internal quotation marks omitted) (quoting Barnett v. Bowen, 794 F.2d 17, 22 (2d Cir. 1988)).

In Butts, the Second Circuit observed that it was mindful of the "often painfully slow process by which disability determinations are made, and that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in a substantial, additional delay." 388 F.3d at 387 (internal quotation marks and citations omitted) (quoting Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 644 (2d Cir. 1983)). In remanding Butts's application, the circuit court instructed the district court "to direct that further proceedings before an ALJ be completed within 60 days of the issuance of the district court's order and, if that decision is a denial of benefits, a final decision of the Commissioner be rendered within 60 days of Butts'

appeal from the ALJ's decision. The district court's order should provide that, if these deadlines are not observed, a calculation of benefits owed Butts must be made immediately." Butts, 388 F.3d at 387. The Commissioner sought a rehearing, asserting, inter alia, that the 60-day time limit was not sufficient time for the SSA to render a decision while complying with its own rules and regulations, and the Court extended the time limit to 120 days. Butts, 416 F.3d at 102.

In light of the fact that more than ten years elapsed between the plaintiff's filing of his initial application and the full briefing of the current motions, we recommend that the District Court require that the proceedings before an ALJ must be completed within 120 days of the issuance of the District Court's remand order.[26]

## CONCLUSION

Based on the foregoing, we recommend that the Commissioner's motion be granted, that plaintiff's cross-motion be denied, and

---

[26] We readily acknowledge that this court's report and recommendation has been a long time (indeed far too long a time) in coming and that our slowness has contributed to the already extended time-line for a final disposition of Lugo's three applications. This part of the delay is of course not attributable to the SSA.

that the case be remanded for further proceedings consistent with this opinion. In addition, we recommend that the remand order require that proceedings before an ALJ be completed within 120 days of the issuance of the order.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Jed S. Rakoff, Room 1340, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**Dated: New York, New York**
**February 8, 2008**

RESPECTFULLY SUBMITTED,

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed
this date to:

Christopher J. Bowes, Esq.
Center for Disability Advocacy Rights, Inc.
841 Broadway, Suite 605
New York, New York 10003

Lorraine S. Novinski, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007